# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Duke Energy Corporation, Petitioner,

v.

South Carolina Department of Revenue, Respondent.

Appellate Case No. 2014-002736

-----

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

-----

Appeal from the Administrative Law Court
Ralph King Anderson, III, Administrative Law Judge

-----

Opinion No. 27606
Heard November 18, 2015 – Filed February 17, 2016

-----

## AFFIRMED AS MODIFIED

-----

Burnet Rhett Maybank, III, of Nexsen Pruet, LLC, of
Columbia; Jeffrey A. Friedman, of Washington, D.C.,
Eric S. Tresh and Maria M. Todorova, of Atlanta,
Georgia, all of Sutherland, Asbill & Brennan, LLP, all
for Petitioner Duke Energy Corporation.

John Marion S. Hoefer, Tracey Colton Green, and
John William Roberts, all of Willoughby & Hoefer,
PA, of Columbia; and Milton Gary Kimpson, of
Columbia, all for Respondent South Carolina

Department of Revenue.

**CHIEF JUSTICE PLEICONES:**  We granted certiorari to review the Court of Appeals' decision affirming the administrative law judge's finding that the principal recovered from the sale of short-term securities was not includible in the sales factor of the multi-factor apportionment formula, and, therefore, Duke Energy was not entitled to a tax refund.  *See Duke Energy Corp. v. S.C. Dep't of Revenue*, 410 S.C. 415, 764 S.E.2d 712 (Ct. App. 2014).  We affirm as modified.

## FACTS

The controversy in this case arises from the South Carolina Department of Revenue's ("SCDOR") computation of Duke Energy's taxable income.

Duke Energy generates and sells electricity.  Because Duke Energy does business in both North Carolina and South Carolina, it must apportion its income to determine its income tax liability in South Carolina.  *See* S.C. Code Ann. § 12-6-2210(B) (2014)[1] ("If a taxpayer is transacting or conducting business partly within and partly without this State, the South Carolina income tax is imposed upon a base which reasonably represents the proportion of the trade or business carried on within this State.").

Duke Energy has a treasury department responsible for purchasing and selling securities, such as commercial paper, corporate bonds, United States Treasury bills and notes, United States money market preferred securities, loan repurchase agreements, and municipal bonds.  In 2002, Duke Energy filed amended corporate tax returns with the SCDOR for the income tax years of 1978 to 2001, seeking a total refund of $126,240,645 plus interest.[2]  In the amended returns, Duke Energy

---

[1] Section 12-6-2210(B) was enacted in 1995 and effective for all taxable years after 1995.  The language of the statute applicable to years prior to § 12-6-2210(B) varies slightly, but the effect is the same.  *See* S.C. Code Ann. § 12-7-250 (1976).

[2] Duke Energy requested recalculation of its tax liability for tax years 1978 to 2001.  The ALC found Duke Energy's claims for tax years 1978 to 1993 were untimely, and this issue has not been appropriately preserved for review by this Court.  *See* Rule 208(b)(1)(D), SCACR (stating an issue which is not argued in the

sought to include the principal recovered from the sale of short-term securities from 1978 to 1999 in the sales factor of the multi-factor apportionment formula. In its original returns, Duke Energy included only the interest or gain from those transactions.

The SCDOR denied the refund request. Duke Energy appealed the decision to the SCDOR's Office of Appeals. The Office of Appeals denied Duke Energy's refund request, finding, *inter alia*, that including recovered principal in the apportionment formula: was contrary to the SCDOR's long-standing administrative policy, would lead to an absurd result, and would misrepresent the amount of business Duke Energy does in South Carolina.

Duke Energy filed a contested case in the Administrative Law Court ("ALC"). The ALC was asked to determine whether Duke Energy, in its amended returns, properly included the principal recovered from the sale of short-term securities in the sales factor of the multi-factor apportionment formula. The parties filed cross-motions for summary judgment. Duke Energy claimed it was required by S.C. Code Ann. § 12-6-2280 (1995) to include all monies recovered from any sales in the "total sales" computation of the apportionment calculation, including the principal recovered from the sale of short-term securities. The SCDOR disagreed, and the ALC granted summary judgment to the SCDOR on this issue. Specifically, the ALC found this issue is novel in South Carolina, and adopted the reasoning of states that have found including the principal recovered from the sale of short-term investments in an apportionment formula would lead to "absurd results" by greatly distorting the calculation, and by defeating the intent and purpose of the applicable statutes.

The Court of Appeals affirmed, albeit applying a different analysis.

We granted Duke Energy's petition for a writ of certiorari to review the Court of Appeals' decision.

---

brief is deemed abandoned and precludes consideration on appeal). Therefore, the law cited herein relates to tax years 1994 to 2001, unless otherwise indicated.

## ISSUE

Did the Court of Appeals err in affirming the ALC's ruling that the principal recovered from the sale of short-term securities is not includable in the sales factor of the multi-factor apportionment formula?

## LAW/ANALYSIS

The Court of Appeals found the ALC correctly concluded the principal recovered from the sale of short-term securities is not includable in the sales factor of the multi-factor apportionment formula, and, therefore, summary judgment in favor of the SCDOR on this issue was proper.  We agree; however, we disagree with the analysis applied by the Court of Appeals.  Accordingly, we affirm as modified.

Questions of statutory interpretation are questions of law, which this Court is free to decide without any deference to the tribunal below.  *Centex Int'l, Inc. v. S.C. Dep't of Revenue*, 406 S.C. 132, 139, 750 S.E.2d 65, 69 (2013) (citing *CFRE, LLC v. Greenville Cnty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011)).  The language of a tax statute must be given its plain and ordinary meaning in the absence of an ambiguity therein.  *Beach v. Livingston*, 248 S.C. 135, 139, 149 S.E.2d 328, 330 (1966) (citation omitted).  However, regardless of how plain the ordinary meaning of the words in a statute, courts will reject that meaning when to accept it would lead to a result so plainly absurd that it could not have been intended by the General Assembly.  *Kiriakides v. United Artists Commc'ns, Inc.*, 312 S.C. 271, 275, 440 S.E.2d 364, 366 (1994) (citing *Stackhouse v. Cnty. Bd. of Comm'rs for Dillon Cnty.*, 86 S.C. 419, 422, 68 S.E. 561, 562 (1910));[3] *Kennedy v. S.C. Ret. Sys.*, 345 S.C. 339, 351, 549 S.E.2d 243, 249 (2001) (citation omitted)

---

[3] We note there is a discrepancy between the South Carolina Reports and the South Eastern Reporter as to the proper party names in *Stackhouse*.  The South Eastern Reporter reflects the case citation as "*Stackhouse v. Rowland*, 68 S.E. 561 (1910)."  However, the South Carolina Reports reflects the case citation as "*Stackhouse v. Cnty. Bd. of Comm'rs for Dillon Cnty.*, 86 S.C. 419 (1910)."  Because the official publication of the decisions of this Court is the South Carolina Reports, we defer to its citation as to the proper party names.

(finding statutes should not be construed so as to lead to an absurd result). If possible, the Court will construe a statute so as to escape the absurdity and carry the intention into effect. *Kiriakides*, 312 S.C. at 275, 440 S.E.2d at 366 (citing *Stackhouse*, 86 S.C. at 422, 68 S.E. at 562). In so doing, the Court should not concentrate on isolated phrases within the statute, but rather, read the statute as a whole and in a manner consonant and in harmony with its purpose. *CFRE*, 395 S.C. at 74, 716 S.E.2d at 881 (citing *State v. Sweat*, 379 S.C. 367, 376, 665 S.E.2d 645, 650 (Ct. App. 2008), *aff'd*, 386 S.C. 339, 688 S.E.2d 569 (2010)); *S.C. State Ports Auth. v. Jasper Cnty.*, 368 S.C. 388, 398, 629 S.E.2d 624, 629 (2006) (citing *Laurens Cnty. Sch. Dists. 55 & 56 v. Cox*, 308 S.C. 171, 174, 417 S.E.2d 560, 561 (1992)).

In South Carolina, if a taxpayer is transacting business both within and without the State, an apportionment formula determines the fraction of business conducted in South Carolina—the tax "base"—upon which the taxpayer's state income tax is calculated. S.C. Code Ann. § 12-6-2210(B) (2014). Regarding the apportionment statutes, "the statutory policy is designed to apportion to South Carolina a fraction of the taxpayer's total income *reasonably attributable* to its business activity in this State." *Emerson Elec. Co. v. S.C. Dep't of Revenue*, 395 S.C. 481, 485–86, 719 S.E.2d 650, 652 (2011) (emphasis supplied) (quoting *U.S. Steel Corp. v. S.C. Tax Comm'n*, 259 S.C. 153, 156, 191 S.E.2d 9, 10 (1972)).

The applicable apportionment formula in this case is the multi-factor formula. The multi-factor formula is a fraction, the numerator of which is the property factor, plus the payroll factor, plus twice the sales factor, and the denominator of which is four. S.C. Code Ann. § 12-6-2252 (2014).[4]

The issue presented in this case regards the calculation of the sales factor within the multi-factor apportionment statute. For the majority of the years at issue, the statute defining the sales factor provided:

---

[4] Section 12-6-2252 was enacted in 2007. Its language, however, is effectively identical to the predecessor statutes that apply to this case: (1) former section 12-7-1140 (1976), which applied to tax years 1978 to 1995; and (2) former section 12-6-2250 (2000), which applied to tax years 1996 to 2001. Section 12-7-1140 was repealed and section 12-6-2250 was enacted in 1995. Section 12-6-2250 was repealed in 2007 when section 12-6-2252 was enacted.

(A) The sales factor is a fraction in which the numerator is the *total sales* of the taxpayer in this State during the taxable year and the denominator is the *total sales* of the taxpayer everywhere during the taxable year.

. . .

(C) The word "sales" includes, but is not limited to:

. . .

(2) sales of intangible personal property and receipts from services if the entire income-producing activity is within this State.  If the income-producing activity is performed partly within and partly without this State, sales are attributable to this State to the extent the income-producing activity is performed within this State.

Section 12-6-2280[5] (emphasis supplied).

In addressing this issue, the Court of Appeals limited its analysis to the concept of "receipts," stating, "We find . . . the issue does not depend on the difference between 'gross' and 'net' receipts.  Instead, the issue turns on whether the return of the principal of these investments is properly characterized as a 'receipt' in the first place."  The Court of Appeals cited Webster's Dictionary to define "receipt," which is the only authority cited by the court in its analysis on this issue.  The Court of Appeals concluded the profit received from the sale of short-term securities was properly considered a "receipt," but the principal of the investment was Duke

---

[5] Section 12-6-2280 was enacted in 1995.  The prior provision, S.C. Code Ann. § 12-7-1170 (1976), required the same calculation, and also utilized the term "total sales."

As discussed *infra*, the definition of the sales factor was changed in 2007.  Prior to tax year 1996, former South Carolina Code § 12-7-1170 (1976), provided for the same calculation of the sales factor.

Energy's "own money," and, therefore, was not a "receipt," and may not be included in the apportionment formula.  We find the Court of Appeals' analysis employs nomenclature that is subject to misinterpretation.

Specifically, we find the Court of Appeals' focus on the term "receipt" has the potential to generate confusion because the term is only relevant to the single-factor apportionment formula under S.C. Code Ann. § 12-6-2290 (2014), which is not at issue in this case.  Rather, it is undisputed on certiorari to this Court that section 12-6-2252, the multi-factor apportionment formula, applies in this case, which uses the term "total sales."  Accordingly, we find the appropriate determination is whether principal recovered from the sale of short-term securities could be included as "total sales" in the sales factor of the multi-factor formula, the relevant term under the apportionment statutes.

Whether principal recovered is includable in the total sales under the apportionment statutes is a novel issue in South Carolina.  We agree with the ALC that extra-jurisdictional cases addressing this issue are instructive, and as explained *infra*, we agree with the states that have found the inclusion of principal recovered from the sale of short-term securities in an apportionment formula leads to absurd results by distorting the sales factor within the formula, and by defeating the legislative intent of the apportionment statutes.

In *American Telephone and Telegraph Co.*, AT&T claimed all receipts received upon the sale of investment paper should be included in the multi-factor allocation formula.  *See Am. Tel. & Tel. Co. v. Dir., Div. of Taxation*, 194 N.J. Super. 168, 172, 476 A.2d 800, 802 (Super. Ct. App. Div. 1984).  The court disagreed, reasoning:

> It is no true reflection of the scope of AT & T's business done within and without New Jersey to allocate to the numerator or the denominator of the receipts fraction the full amount of money returned to AT & T upon the sale or redemption of investment paper.  To include such receipts in the fraction would be comparable to measuring business activity by the amount of money that a taxpayer repeatedly deposited and withdrew from its own bank account.  The bulk of funds flowing back to

AT & T from investment paper was simply its own money. Whatever other justification there is for excluding such revenues from the receipts fraction, it is sufficient to say that to do otherwise produces an absurd interpretation of [the apportionment statute]. "It is axiomatic that a statute will not be construed to lead to absurd results. All rules of construction are subordinate to that obvious proposition. [Even the rule of strict construction] does not mean that a ridiculous result shall be reached because some ingenious path may be found to that end."

*Id.* at 172–73, 476 A.2d at 802 (quoting *State v. Provenzano*, 34 N.J. 318, 322, 169 A.2d 135, 137 (1961)); *see also, Sherwin-Williams Co. v. Ind. Dep't of State Revenue*, 673 N.E.2d 849 (Ind. T.C. 1996) (finding persuasive the Superior Court of New Jersey, Appellate Division's rationale concluding any interpretation of the apportionment statutes allowing for the inclusion of principal produced absurd results).

Similarly, in *Walgreen Arizona Drug Co.*, the appellate court was tasked with determining whether "total sales" in the sales factor of the apportionment formula included principal recovered from short-term investments. *See Walgreen Ariz. Drug Co. v. Ariz. Dep't of Revenue*, 209 Ariz. 71, 97 P.3d 896 (Ct. App. 2004). The Arizona Court of Appeals found the reinvestment of funds, for example, in inventory, reflected ongoing business activity and did not "artificially distort the sales factor as does inclusion of unadjusted gross receipts from investment and reinvestment of intangibles."[6] *Id.* at 74, 97 P.3d at 899. The Arizona court further found including the principal from the sale of investment intangibles in the apportionment statute would create a tax loophole for businesses engaged in sales within and without the state, which was neither intended by the Arizona legislature, nor required by the plain meaning. *Id.* at 77, 97 P.3d at 902. Accordingly, the court held the return of principal from the types of short term

---

[6] The statute in Arizona applicable at the time defined "sales" as "all gross receipts." *See* Ariz. Rev. Stat. Ann. §§ 43-1131(5), 43-1145 (1983).

investments at issue were not includable in the sales factor denominator.[7] *Id.*

We find the inclusion of principal recovered from the sale of short-term securities distorts the sales factor and does not reasonably reflect a taxpayer's business activity in this state. *See Emerson Elec. Co.*, 395 S.C. at 485–86, 719 S.E.2d at 652 (citation omitted) ("the statutory policy [as to the apportionment formulas] is designed to apportion to South Carolina a fraction of the taxpayer's total income *reasonably attributable* to its business activity in this State."). We further find the resulting distortion leads to absurd results that could not have been intended by the General Assembly. *See Kiriakides*, 312 S.C. at 275, 440 S.E.2d at 366 (citation omitted) (stating courts will reject that meaning when to accept it would lead to a result so plainly absurd that it could not have been intended by the General Assembly).

The record in this case demonstrates conclusively that a taxpayer could manipulate the sales factor by the simple expediency of a series of purchases using the same funds. As was indicated by the Court of Appeals, the following illustration elucidates why, from a common-sense standpoint, Duke Energy's position leads to absurd results. *See Kiriakides*, 312 S.C. at 275, 440 S.E.2d at 366.

Duke Energy's Assistant Treasurer and General Manager of Long Term Investments, Sherwood Love, testified by way of deposition that the short-term securities transactions at issue consisted of Duke Energy's Cash Management Group investing large sums of money "pretty much every day," which were typically left outstanding for less than thirty days. Mr. Love's deposition provided an example of a typical transaction controlled by the Cash Management Group. Specifically, the example provided: $14,982,900 was invested in a short-term instrument on August 7, 1996; the instrument was then sold eight days later on August 15, collecting $17,000 in interest; Duke Energy then immediately reinvested the approximately $15,000,000 in another short-term instrument. Under Duke Energy's theory, the transaction described yields a $15 million "sale" to be included as "total sales" in the denominator of the sales factor, as it was a "sale" outside of South Carolina. Further extrapolating under Duke Energy's theory, if the Cash Management Group had decided instead to sell the instrument on August

---

[7] The types of short-term investments at issue were similar to those at issue in the instant case: U.S. Treasury bonds, notes, and bills; and bank certificates of deposit.

10, immediately reinvest the money, and sell the second instrument on August 15, its "total sales" in the denominator of the sales factor during the same time period as above would be approximately $30 million in principal alone. As a more extreme example, we could assume Duke Energy sold and reinvested the $15 million on August 9, August 11, August 13, and August 15. Duke Energy's theory applied to this example would result in its "total sales" outside South Carolina for purposes of the apportionment formula being reported as approximately $60 million dollars in principal alone. Accordingly, under Duke Energy's theory, the frequency of investments made within that eight day window would dictate how large or small Duke Energy's "total sales" would be reflected in the denominator of the sales factor of the multi-factor apportionment formula. The artificial inflation of the denominator of the sales factor allows a taxpayer to significantly reduce its tax liability in South Carolina in a manner clearly inconsistent with the legislative intent and logical interpretation of the term "reasonably attributable." *See Emerson Elec. Co.*, 395 S.C. at 485–86, 719 S.E.2d at 652 (citation omitted) ("the statutory policy [as to the apportionment formulas] is designed to apportion to South Carolina a fraction of the taxpayer's total income reasonably attributable to its business activity in this State.").

We find the potentially drastic impacts such cash management decisions have on determining a company's business activity demonstrates the absurdity that results from Duke Energy's position. Duke Energy's view would require two taxpayers, equal in all respects except for their level of investment activity, to report drastically different results in the taxable income reported through application of the multi-factor apportionment formula due solely to the difference in frequency at which the taxpayers roll over their investments. Plainly, counting the same principal that is invested and sold repeatedly as "total sales" can radically misrepresent any taxpayer's business activity.

We find this illustration further demonstrates Duke Energy's position could not have been intended by the General Assembly, and defeats the legislative intent of the apportionment statutes—to reasonably represent the proportion of business conducted within South Carolina. *See* S.C. Code Ann. § 12-6-2210(B) (2014) ("If a taxpayer is transacting or conducting business partly within and partly without this State, the South Carolina income tax is imposed upon a base which reasonably represents the proportion of the trade or business carried on within this State."); *Kiriakides*, 312 S.C. at 275, 440 S.E.2d at 366 (citation omitted) (finding

regardless of how plain the ordinary meaning of the words in a statute, courts will reject that meaning when to accept it would lead to a result so plainly absurd that it could not have been intended by the General Assembly).

Further, the General Assembly enacted S.C. Code Ann. § 12-6-2295 (2007), defining the term "sales" in the apportionment formulas, effective for taxable years after 2007.  Section 12-6-2295(B) explicitly excludes from the sales factor: (1) "repayment, maturity, or redemption of the principal of a loan, bond, or mutual fund or certificate of deposit or similar marketable instrument;" and (2) "the principal amount received under a repurchase agreement or other transaction properly characterized as a loan."  We find the General Assembly's decision to define "sales" in § 12-6-2295, supports our finding that the legislative intent has always been to exclude such distortive calculations from the apportionment formulas.  *See Stuckey v. State Budget & Control Bd.*, 339 S.C. 397, 401, 529 S.E.2d 706, 708 (2000) ("A subsequent statutory amendment may be interpreted as clarifying original legislative intent."); *Cotty v. Yartzeff*, 309 S.C. 259, 262 n.1, 422 S.E.2d 100, 102 n.1 (1992) (citation omitted) (noting light may be shed upon the intent of the General Assembly by reference to subsequent amendments which may be interpreted as clarifying it); *see also See  Emerson Elec. Co.*, 395 S.C. at 485–86, 719 S.E.2d at 652 (citation omitted) ("the statutory policy [as to the apportionment formulas] is designed to apportion to South Carolina a fraction of the taxpayer's total income reasonably attributable to its business activity in this State.").

Accordingly, we find the inclusion of principal recovered from the sale of short-term securities produces absurd results, which could not have been intended by the General Assembly.  Therefore, we affirm as modified the decision by the Court of Appeals.  *See Duke Energy Corp. v. S.C. Dep't of Revenue*, 410 S.C. 415, 764 S.E.2d 712 (Ct. App. 2014).

The Court of Appeals' decision is therefore

**AFFIRMED AS MODIFIED**

**HEARN, J., and Acting Justices James E. Moore, Robert E. Hood and G. Thomas Cooper, Jr., concur.**